Good morning, Kevin Joel Page for Mr. Stallings. Your honors, at the time Mr. Stallings put his bags down and left them unattended in a Wells Fargo branch, there was no good reason to think that they contained a bomb. He didn't say or suggest that they contained a bomb. There was nothing written on them of significance. They made no noise and they were visually indistinguishable and in all other ways indistinguishable from any other piece of luggage. What were in the bags? In the bags were vodka. It was sort of a hodgepodge of dubious value. The most significant thing that was in the bags was Mr. Stallings' ID or a bunch of information, personally identifying information for Mr. Stallings. But mostly it was clothes and toiletries and some other... In other words, nothing unsafe or dangerous or threatening to anybody? No, that's correct. So then what lesson was he trying to teach the bank? Well, I think that if he... Excuse me. I mean, if the court accepts that statement, then there is evidence that Mr. Stallings... Why would we not accept that statement? We wouldn't accept that statement because it's contradicted by the first prior statement of Mr. with the bus driver, which is that not that he left a bomb there, but that they believed that he left a bomb there. And in fact, that's how the prosecution opened the case was... I'm just looking at the testimony. This is, I believe, the examination of the dark bus driver. And she said he had some kind of disagreement with a white female teller. She was giving her a hard time. He was pissed off with her and that he was teaching her a lesson. He was going to teach her a lesson. Yes. I agree that that testimony is present in the record and would defeat a sufficiency claim as to the defendant's intent. Right. But I just want to try to ask is what lesson do you teach with your clothes and vodka and Christmas decorations? Well, the inference there, the reasonable inference to draw there is that that he wished for them to believe that there was something harmful in the bag. Right. So if he believes it was a reasonable belief that this would be dangerous, in fact, he was counting on it. Why? Why can we reverse on the grounds that there was no reasonable belief? Well, because that primarily because his subjective belief that there was that it's reasonable to think that there is a bomb in the bag is not evidence of an objective belief that there is no reason that there is no bomb, that there is a bomb in the bag. In that situation, I think Congress included. For you to prevail on this argument, we'd have to treat your client as having an unreasonable belief. That's right. That's right. And I think that's and Congress intended that that part of the of the statute that says under circumstances where it may be reasonably believed as a check on liability, both for situate for for defendants who intend to make a hoax or a bomb threat, but don't do so in a way that people reasonably believe or for liability, for situations in which other people react to it in a way that, in other words, this the Congress intended for this court to exercise its independent judgment as to the reasonableness of that belief. If I understand correctly, the bank employees called the police. They called the police, they called them third in the sequence of situations that that call is in the record. It's government's exhibit five. I don't believe it's if you regard it as innocuous. In other words, if you if you think that the Mr. Stallings, his belief is unreasonable, normally you don't call the police. You just put it in lost and found. Right. Well, no, because they they said that the reason there is testimony that the reason they called the police and government's exhibit five well bears this out was to was to try to get a trespass warning for Mr. Stallings because they didn't want him to come back to the bank that he had behaved offensively there in the past. And in fact, in that call, government's exhibit five, which is only three minutes, I commend it to the they asked the police essentially they begin by asking the police essentially for for the right to treat it as abandoned and to put it outside. And only when the they're unable to obtain a trespass warning, to obtain a police officer, to come and issue a trespass warning, do they begin saying, I'm uncomfortable putting the bag outside myself. And so the police, the call to the police does not substantiate the reasonable belief in the bomb who called in. Do I understand correctly? Eventually, somebody called for a bomb squad. Yeah, that that happened through the police that so that they the police that was not a request from from the bank. Okay. And so the bank employees may not have been afraid, but the police were. Well, I don't know that the police were afraid the police were acting with a prudent resolve to be safe than sorry, rather safe than for for whatever probative value that has. But I don't know that necessarily that the police are saying that they believe this is a bomb or is likely to be a bomb. They're just they're doing what the police do, which is to take to err on the side of keeping everybody safe. So so I want to I want to point out that how different this case is from from every other case that that seems to be in the Federal Reporter about this case that applies the statute, which is in that there is nothing in the Federal Reporter. No case in the Federal Reporter involves information that is remotely this ambiguous. Every other case that that I can find that's in the Federal Reporter involves a defendant who is being clear about what kind of threat they're they're trying to make. And I submit to you part of the reason for that is that that is the usual means by which people make threats. And so it is likely what Congress is targeting. But it's also the definitive language in the statute that the information must indicate that a violation has taken is taking or will take place. And so for that reason, this is a very different kind. The ambiguity in the defendant's actions, together with the very unusual nature of an actual credible terrorist attack, a violation of the terrorist statutes ought to give this court a very serious pause. And and I do want to urge the court to consider its independent duty to evaluate the reasonableness of a belief that a violation of the statute is occurring when it when it evaluates the sufficiency of the of the evidence. And as soon as we begin deferring to the the actions of individual people, the beliefs of which is not merely to make sure the liability is not too expansive, but probably to to protect First Amendment values, which is that which is to require that that a threat be objectively reasonable. What immediately comes to my mind is when you're in an airport and you constantly hear over the loudspeaker, please do not leave your bags out. And if you're told if you see a bag that's unattended, report it. I mean, the inference there we all draw is that it could be a bomb. And so. As the note in the reply brief, that still happens all the time that people leave their bags unattended in the airport. It's it's bags left unattended by accident on buses. That's in record from from Ms. Lumpkin in the case. And yet, you know, that may be it may be reasonable to exercise caution in that situation, but it's not reasonable to believe that it is an actual terrorist attack occurring. I want to I do want to make sure that I cover my issue with the argument, my chief issue with the government's argument in this case. One more question. You mentioned your concern about reading liability too broadly under the statute, and I certainly understand and sympathize with the notion that we don't want this to go after crazier hypotheticals. But why does the why does and you mentioned the First Amendment? Why doesn't the intent mens rea element take care of any concerns about stretching the statute too far? Well, because it's not going to go after people who genuinely did not intend to create any harm. I disagree with that, your honor, or at least I disagree with that under the reading of the statute that appears that has prevailed, for instance, in the Ninth Circuit, which is that the statute requires only an intent to speak falsely. And so that or even only misleadingly. And so in that situation, so it required under that reading, the statute requires only an intent to speak falsely or misleadingly, plus a reasonable misunderstanding about what the defendant intends. And so that that raises a serious First Amendment issue and also just an the scope of statute. Or what if we read the statute, as I think you suggest, that the information not just be false, but that it's it's information about a crime. Yeah, I agree that enumerated crimes that would that would mitigate the concern about the scope of the liability. But it would also call for reversal in this case for another reason, which is that the the jury instructions in this case, if they say that and they you know, there is there is a fair reading that they say that, but they don't say that very clearly. So under Jones, where you have a jury instruction, which doesn't necessarily communicate that, then then you have to reverse on the grounds of the jury instruction. I do want to cover my my issue in particular with the the bomb suit argument just to orient the court very briefly over objection. The prosecution was allowed to argue that the had done so for 20 years to protect the community and to contrast that with an image of the snickering defendant walking away from the crime and to do that as part of an extended argument about victim blaming. I submit to the court that every relevant consideration about this argument suggests that the court must reverse on this ground. It is it to the extent that is distinguishable only in that there is a greater call for reversal here. There are at least nine considerations that suggest that this that reversal is the appropriate remedy for this. First of all, it was highly emotionally charged. It's a discussion of the bravery of a law enforcement, a very brave law enforcement officer trying to protect the community. Two, it is just like it is materially indistinguishable from the arguments in McCann and Aguilar, which were both found to be improper. Aguilar under plain error. If you look at in the briefing at the nature of those arguments, it is very difficult to find a meaningful distinction. Number three is preserved. It was not preserved in Aguilar and still resulted in a plain error reversal. Number four, it was overruled. The argument was overruled and therefore there was no contemporary cautionary instruction about what to make of this of this statement. The only thing the jury could have the most likely message the jury received from the court is that it was okay to consider this and precisely the way the prosecution asked them to consider it. Number five, it was a closed case. This is not a case where there was overwhelming evidence that it was reasonable to believe that there was a bomb threat or even that's what the defendant intended based on the mere act of laying the packages. Number six, in Gongora, this court has recognized that an argument made near the time of deliberation that is in rebuttal closing has more may have more power with the jury than other than other arguments. Number seven, it pertained to a non witness to a non testifying witness. So there is it had no logical tendency to demonstrate the defendant's guilt or the credibility of any prosecution witness. It is merely an emotional plea to the defense. Bring up the fact that Corporal Walton didn't testify at the trial. Didn't the defense bring that up? He did. He did. We did. So the defense brought up this non testifying witness. And I guess what I'm concerned about is what was it about that statement, even assuming it was inappropriate for the prosecutor to make that statement? What was it about that statement that actually because the objection was that it was bolstering? What was it about that statement that bolstered the testimony of Corporal Walton supervised? Well, the bolstering, I think, is a is sort of a shorthand reference for the entire bolstering case law. The prohibition on emotional appeals to the to the to the sensibility of law enforcement appears in the bolstering case law. It's in Kikau and McCann and Aguilar and in the United States versus Sean Jefferson. Tellingly, the government has never contested preservation of this issue. I guess I just don't understand what would have been so harmful about that testimony. The supervisor just testified that Walton X-rayed the bags and then about what was found in the bag, I guess, which we all know was nothing harmful. So I don't understand how bolstering if we even if we assume that it was that I don't understand how bolstering the testimony about what was found in the bag hurts. Well, the reason that it hurts is that it asked the court, it asked the jury, it invites the jury to disregard reasonable doubts about the defendant's guilt and render any verdict based on its emotional feelings about the the propriety of attacking law enforcement or the propriety of questioning the behavior of of law enforcement in in the case. I would actually, if the with the court's indulgence, like to proceed and use some of the rebuttal time to to open on the the matter of sentencing. So just to discuss that, to briefly discuss the sentencing error, I submit to the court that to see and correct the district court's reliance on bare arrest records, this court need only take the trial judge at its word. He said twice that the upward departure was imposed for the reasons stated on paragraphs 162 and 163. And in fact, that's the only explanation for the sentence that's offered in the statement of reasons. Paragraph 162 and 163 names 34 offenses that are substantiated only by a bare arrest record. The the probation also notes that 11 of the 162 were violent and that one of the bare arrest ones, bare arrest cases is was the defendant's earliest offense in the situation that the government points out that the district court, when it's at sentencing, named the convictions, the defendant's uncounted convictions as a basis for its upward departure. But it never said that this was the exclusive basis for the sentence. To the and I want in particular, just in closing to to emphasize that that as the government noted, the court proceeded step by step down the chart, incrementally rejecting each intermediate range that demonstrates that the substantial rights question in this case is not merely whether or not the the district court was inclined to depart or very upward. It likely was, but whether it would have imposed the same sentence. And this demonstrates that it was open to sentences between the top of the guideline range and the sentence upon which it ultimately settled. Thank you. Thank you. Excuse me. May it please the court. Good morning. Amy Birch for the United States and I'm appearing with counsel Emily Faulkner. Though Mr. Stallings raises several issues on appeal, none warrants reversal of the jury's verdict or the court sentence. I'll be discussing the sufficiency of the evidence and jury instruction arguments and then Ms. Faulkner will take the closing arguments issue and the sentencing issues. First, I'd like to address the the argument that this court should apply de novo review to the second element of the offense, which is the reasonably under circumstances where such information can be reasonably believed. Mr. Stallings cites Supreme Court case and an unpublished Fifth Circuit case, but neither of those cases deal with an element of the offense. One talks about the reasonable suspicion standard for law enforcement for probable cause, and another one talks about whether SORNA is a general or specific intent crime. And so to the extent that that there's this argument that this court should independently evaluate what a reasonable person would do, say, or believe separated from the jury verdict, that's just not correct. The jury verdict or the jury's view of the evidence on each one of the elements is entitled to deference. As to the first element, whether Mr. Stallings engaged in conduct with the intent to convey false and misleading information, Mr. Stallings concedes that the government's evidence would defeat a sufficiency challenge to that. And so he goes on just then to challenge the second and third elements, which is whether that information was conveyed under circumstances where it may be reasonably believed, which is what the statute requires, and where the information indicates that an activity has taken, is taking, or will take place that would constitute a violation of certain statutes. And here the government charged the statute related to explosives. So the circumstances, as the record bears out, is that, you know, this defendant had an ongoing dispute with the bank. He had been not just angry, but over the top in his behavior previously with the bank. He had, on three prior occasions, had to be asked to leave the bank. Two of those occasions he had thrown things at the tellers, made a mess on the floor, threw a soda cup where the soda went everywhere, threw pamphlets and things that were on the ground. And then on the last time he had been escorted out of the bank, he turned around and unzipped his trousers and was making lewd gestures at the bank staff. For that reason, he was banned from coming back to the bank. There was testimony that he had never brought bags into the bank before. They had not seen this man with bags. And any sort of notion that, okay, this is just a transient homeless guy who's all of his life's belongings in his bags wasn't even borne out by what was in the bags, which was not all of his clothing that we see in the pictures, in the testimony from the multiple times he went to other banks. So there were there was testimony about him that the bank staff didn't seem to act as if this was a serious or even any kind of threat. Well, I disagree with that characterization. The bank staff, in the beginning, when they didn't evacuate, they went behind the bulletproof barrier that was in the bank. They did not immediately evacuate. They let customers come in, right? They did. They did let customers come in. How close did they get to the bag? How close did they let customers get to the bag? Well, the bags were in a lobby waiting area. And so there was a customer that came in through the lobby after they became aware of the bags. There was some testimony that they were not allowed or not supposed to close the branch without the higher level approval. And it was the security people that wanted them to just move the bags. And the people that were inside the bank were the ones saying, I don't feel comfortable doing that. I don't think that's safe. And there was even some dispute between the two tellers. There was one person that was maybe a little more willing to move the bag and the other one that was going, that's not safe. Let's not do that. And so at that point, they did call the police. But the idea that nobody was that concerned, I mean, they were concerned enough to place calls to security, call the police. And then within about- But the council said that the reason they called the police had nothing to do with the bags. Well, no, that's not, I mean, that's what he said. But what the testimony was is that they were concerned about the bags. Every one of them testified that they were concerned about the bags. What Mr. Stallings is asking the court to do is look at the 9-1-1 call and decide that the testimony that they gave from the stand isn't true compared to the 9-1-1 call. And given the standard of review here, which is deference to the verdict, this court has to take what they said at their word from the witness stand, which is they were afraid of the bags and they thought there were Just so I understand the record correctly, if this may or may not be dispositive, is opposing counsel correct that the 9-1-1 call did not refer to the bags? The 9-1-1 call, they did tell them that there were bags in the 9-1-1 call. And ultimately, the police come, they talk to the, the first officer comes, they realize that about the bags again, and that's when the decision to deploy the bomb squad is made. I would like to say to let the court know that it is important to remember that when Mr. Stallings got on the bus and said, I left a bomb on the bus, I'm sorry, he said, I left a bomb in the bank. That was before the bomb squad had arrived, but after it had been deployed. And so any sort of idea that, oh, he saw a bomb squad and then decided to kind of make up this story on the bus is not borne out by the evidence or the testimony. And then when Mr. Stallings, when Mr. Stallings gets on that bus, he tells them exactly why he wanted the bank people to believe that there was a bomb and it's because he wanted to teach somebody a lesson. But going back to the, going back to the, the part of the discussion about do the bags convey a bomb threat? They did not say bomb. He did not tell the tellers, I have a bomb. That came later to the bus, to the bus person, to Ms. Lumpkin, who was driving the DART bus. What he said, what he did is he came in and there was some testimony about the video about how he sort of placed the bags and turned his body a certain way. He asked to speak to the manager to make sure they know he's there. And then he asked for some extra time and when they turn around, he's gone. And so just like the presence of bags abandoned in a, in an airport or a bus station or whatever, I mean, the bags themselves were the message of, that communicated the presence of a bomb. And that's not unreasonable. That's commonly understood. And it's not just what these tellers subjectively believe, although their subjective belief is, I think, relevant to the evaluation of what could be reasonably believed. But the jury heard this evidence and believed it. Judge Fitzwater heard this evidence and felt that it was sufficient. He didn't deny the defendant's motions for acquittal. And so it's not just what did one or two tellers believe, or what did the police on the scene believe, although all of those people are presumably reasonable people. It's what the 12 people in the box believed and what they said. And for that pass to Ms. Faulkner for her discussion of the remaining issues. Thank you. Faulkner. May it please the court, Emily Faulkner, also here for the government. I want to start out to, I'll be here talking today about the closing statements as well as sentencing to the extent that court has questions about that. With respect to the closing statements, it's important to start here with some first principles about what these rules do and sort of how to evaluate this sort of bucket of claims. The first one, and the most important is that context is essential. This court has said over and over again that we must look at the context of the statement. Why were they said and what context were they made? And this goes to Judge Gray's point about the supportive bolstering argument. What was the purpose of that statement? How did it make the jury more likely to believe or disbelieve any of the testimony that was in the record? But really what you had was just a situation where defense counsel, their own volition, decided to throw some dirt on an officer that wasn't testifying, who didn't really have any particularly key role other than kind of he was the one that went down range and took some photos, but he wasn't a witness at trial. And so the government did rehabilitate him. One point I would make about the bomb suit is that even in closing argument, defense counsel was the first one to say that he put on the suit. I mean, in defense counsel's closing argument, she said, oh, you've heard that this guy put on the suit. So then the government said the same thing, but really the context there is it's just difficult to understand how that statement was improper in that context. The second sort of first principle we want to look at is the standard of review. And that is important here. Mr. Page pointed out that most of these objections were preserved. Even the one that he reports as plain error in his reply brief, he says, that actually was arguably preserved. So that is an important fact, because what that means is that the person who had the best view of the context for these statements, that's Judge Fritzwater, who sat through the whole trial, who's looking at the context, not only of the full argument, which he heard, but also the arguments that proceeded at which he also heard, but also all the testimony which he also heard. And he heard the objections and overruled them, which means the question is, you know, was that an abuse of discretion? I mean, that's the standard we're looking at. Was it so improper that it was an abuse of discretion for him to overrule the objection? And then finally, the prejudice piece, you know, again, looking at a high level, the question is really, to the extent that these statements were improper, did it make it any more likely that the jury convicted him for some reason other than the evidence that was in the record? And I just don't think we have any of those shown satisfied here. Going back to some of what Mr. Page said in his argument, he kind of lumps together a number of statements here, but you have the idea that he put on the bomb suit, the contrast with the comment about the snickering. One point of clarification on snickering, because we seem to have some, be operating from different definitions of that term. Snickering, just the dictionary definition, is, you know, kind of to suppress a laugh or quietly suppress a laugh, laugh to oneself. That's in the Oxford English Dictionary, Merriam-Webster. So it's difficult to understand how talking about the officer and talking about defendant snickering is a, quote, vivid moral contrast, or that it's highly emotionally charged. As Mr. Page said, it's not an emotional term. And there was ample evidence in the record that he was, he was satisfied with what he did, that he went across, he bragged about what he did, he felt happy about it, he said he could teach them a lesson. So it's not a large, inferential leap to say that he was, that he thought it was funny, you know, in some kind of quiet way. The victim-blaming argument, I mean, that this court has repeatedly said that a prosecutor can make a characterization, even a colorful characterization, of defense counsel's arguments. And this, that's exactly what, you know, the victim-blaming piece was. It was, you know, the main defense was over and over again, well, the guy in the bomb street, he was a dirty cop. And those bank tellers, you know, if they were really so scared, why did they go screaming out of the bank? Those were actually defense counsel's words. They weren't really scared. I mean, and so the prosecutor characterized all those defenses as, quote, victim-blaming, that it's all about everybody but Mr. Stines and his own personal responsibility. And that, this court has repeatedly said, I mean, that, you know, the prosecutor is any attorney and it's expected for a trial attorney. I'm not a trial attorney personally, but that kind of colorful language and colorful characterizations are proper, especially when they are just referring to arguments. I would just briefly, if the court doesn't have concerns about any particular arguments, I would just briefly move on to the sentencing piece. I think we covered that fairly well in our brief, but we've got a pretty thin read that we're working off here. The fact that the court adopted the PSR, sure, and the PSR in summarizing the criminal history did include every single piece, every arrest and so on and so forth. But what Judge Fitzwater said on the record was that he was relying on the fact that Mr. Stines had double the criminal history points from counted adult convictions that he needed to reach a criminal history category of six, that he had a number of other adult convictions that didn't even count. So we're not talking about unadjudicated conduct here. Further, defense counsel stood up at sentencing and said, we know you're probably going to vary upward from the guidelines that are based on this criminal history. And if you do so, we would request that it be a sentence of 48 months, which was exactly the sentence that he got. So it's very difficult to understand how we're now going to go look at this and say that what happened here was some kind of miscarriage of justice or was so unfair just because of a brief reference to adopting the PSR. That's not an argument that stands up to scrutiny. So if the court doesn't have any questions about these points, we would ask the court to affirm the conviction and sentence in full. Thank you. Thank you, Mr. Page. Just to clarify a couple of record points in the colloquy with Ms. Birch and Judge Ho. The call to 911 does mention the bags. It begins by asking for a trespass warning and says that the employee wishes to treat the bags as abandoned. And then when she can't get an officer to come do the trespass warning, then says, I'm uncomfortable moving them. And that's the first suggestion that she is uncomfortable moving them. And there's no suggestion, no mention of anything dangerous in the bags in that call. On page 458, the witness does indicate that her motive for making the call to the police was to obtain a trespass warning. And that's on page 458. To answer directly the question Judge Ho asked about whether or not they let customers stand next to the bag on page 456 of the record, it indicates that they did permit customers to stand right next to the bag. And that while some of all but one of the employees went behind the bulletproof glass, it was, the evidence is clear, it was business as usual for customers. New customers came in. Some of them stood directly next to the bag. Ms. Birch made the point that the defendant's bag did not contain all of his worldly possessions. But of course, the significant point is what a reasonable observer would have thought just upon seeing the bags laid there. And at that point, Mr. Stallings had certainly presented as homeless or at least transient in his prior occasions to visits to the bank. He couldn't, all of his debit card requests had been returned because he didn't have a stable address. He couldn't get an ID. This is not the kind of person that it is reasonable to think could create a weapon of mass destruction. And he had also presented as violent and angry in the past. And he also presented as that. Well, he had presented as he certainly presented as angry. I don't know that he had presented as, as violent, but when you throw things, and I'm assuming you throw things off a display and you're tossing cups at the, maybe that's not violent, but it's certainly not customary behavior. It's rude. It's not acceptable conduct. But, but, but I think a reasonable observer has to make some, um, uh, accommodation for the fact that violations of the terrorism statutes, actual violations of the terrorism sections are exceedingly rare. People walk out of DMVs and banks and airports angry and in shouting matches all the time. And we don't assume a point I want to make as to the abuse of discretion issue, um, on the closing argument is that the propriety of the statement is not evaluated according to abuse of discretion. It's evaluated to no vote. That's McCann at 494. I think that's the time I have. Thank you. That will conclude the argument in this case. I have under submission. Thank you.